IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DORA DUCK, | ) | CASE NO. 5:12-CV-02900 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff  Dora Duck ("Plaintiff" or "Duck") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I.  Procedural History

As discussed more fully below, this case comes to this Court following an administrative

hearing held and decision issued after a remand by the Appeals Council.  On June 8, 2006, and

June 27, 2006, Duck filed applications for DIB and SSI.  Tr. 147-50, 219-226.  In her

applications, Duck alleged a disability onset date of December 20, 2002.  Tr. 219, 224, 264.  She

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R.
CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

alleged disability based on Graves disease[2] and mental health issues. Tr. 167, 170, 176, 179, 275. After initial denial by the state agency (Tr. 167-72), and denial upon reconsideration (Tr. 176-81), Duck requested a hearing (Tr. 182-83).

**A.      2009 Administrative Hearing and Decision and 2010 Remand Order**

On March 10, 2009, an administrative hearing was held.  Tr. 95-146.  On May 27, 2009, the Administrative Law Judge ("ALJ") issued a decision wherein she determined that Duck had not been under a disability from December 20, 2002, through the date of her decision.  Tr. 151-62.  Duck requested review of the May 27, 2009, ALJ decision and, on July 28, 2010, the Appeals Council vacated the hearing decision and remanded Duck's case for further administrative proceedings.  Tr. 163-66.  The Appeals Council remanded the case for further evaluation of Plaintiff's mental impairments; further consideration of Plaintiff's maximum residual functional capacity; re-evaluation of Plaintiff's past work and whether it could be considered past relevant work; and, if warranted, further vocational expert testimony to clarify the effect of the assessed limitations on the Plaintiff's occupational base.  Tr. 164-66.

**B.      2011 Administrative Hearing and Decision following Remand**

Following the Appeals Council's remand order, a second administrative hearing was held before another ALJ on August 2, 2011.  Tr. 33-94.  In his August 26, 2011, decision, the ALJ determined that Duck had not been under a disability from December 20, 2002, through the date of his decision.  Tr. 10-32.  Duck requested review of the August 26, 2011, decision by the Appeals Council.  Tr. 6-9.  On October 19, 2012, the Appeals Council denied Duck's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

---

[2] Graves disease is "a syndrome of diffuse hyperplasia of the thyroid, with female predominance; it usually has autoimmune etiology and has been linked to autoimmune thyroiditis."  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 541.

## II. Evidence

**A.      Personal and Vocational Evidence**

Plaintiff was born on October 5, 1966.  Tr. 219.  She took special education classes through the ninth grade.[3]  Tr. 42.  At 18 years of age, Duck married and moved to California with her husband.  Tr. 367.  She resided in California for the next 15 years and worked a number of manual labor jobs.  Tr. 367.  Around 2005, Duck divorced her husband and moved back to Ohio where she resides with her children.  Tr. 50, 367.

**B.      Medical Evidence**

**1.      Treatment Records[4]**

In 2001, 2002 and 2003, Duck was periodically seen at the offices of Susan Hake, M.D., for treatment of her hypothyroidism.  Tr. 373.  In 2006, Dr. Hake reported that her last recorded visit with Duck was on April 22, 2003.  Tr. 373.  Dr. Hake was unable to comment on Duck's then current abilities or disabilities.  Tr. 373.  Treatment records reflect that, thereafter, in 2003 through 2006, Duck treated with providers at Family Practice of Doctors Hospital for her thyroid condition and other ailments, such as pressure in her ears, sore throat, and a rash.  Tr. 343-62.

In 2005, Duck attended two counseling sessions with Trillium Family Solutions but then withdrew from treatment.  Tr. 321-41, 339.  During intake, Duck reported difficulties, including appetite and sleep disturbance, preoccupation around her impending divorce and custody battle, and her children acting out.  Tr. 330.  When closing Duck's file, a therapist with Trillium Family

---

[3] During ninth grade, Duck was not in special education classes.  Tr. 42.  She did not complete the ninth grade.  Tr. 42.

[4] Plaintiff references 2012 psychiatric medical records which post-date the ALJ's August 26, 2011, decision and therefore are not pertinent to this Court's review.  Doc. 17, p. 8 (citing Tr. 463-67).

Solutions noted that Duck's primary concern related to her son, who was struggling with substance abuse.  Tr. 340-41.

Duck treated with providers at Mercy Medical Center in 2007 and 2008.  Tr. 409.  On January 16, 2008, Duck sought treatment at Mercy Medical Center, requesting that her thyroid be checked because she had had some hoarseness in her voice and a sore throat for approximately six weeks. Tr. 402-04.   She was also concerned about depression and anxiety. Tr. 402-04.  During that visit, Teri Sanor, M.D., and Kathleen Ann Senger, M.D., treated Duck. Tr. 404.  They assessed Duck with hypothyroidism and, following a recheck of her TSH levels, they planned to adjust Duck's medication.  Tr. 404.  They also assessed her with depression and anxiety and prescribed Zoloft, noting it had been effective but Duck had run out of the medication.  Tr. 404.  The doctors discussed the benefits of counseling but Duck was not interested in counseling at that time.  Tr. 404.

Also, during 2008, Duck treated with Affinity Medical Center for her hypothyroidism. Tr. 421-28.  On July 31, 2008, a sonogram was performed of Duck's thyroid.  Tr. 429-30.  The sonogram revealed a "small thyroid with an incidental tiny cyst involving the superior portion of the left lobe of the thyroid." Tr. 430.  No other abnormalities were noted.[5]  Tr. 430.

In September 2010, Duck switched providers from Affinity Medical Center to Aultman Physician Center.  Tr. 448.   She continued to treat with Aultman Physician Center through April 14, 2011.  Tr. 445-47.  On September 13, 2010, Duck saw Dr. Jigna Janani and Dr. Richard Ziegler with the Aultman Physician Center for follow-up on her hypothyroidism.  Tr. 448-49. The physicians noted that Duck had hypothyroidism and that her recent blood work came back showing a normal TSH level.  Tr. 449.  On November 11, 2010, Duck saw Drs. Janani and Narayanan for a pre-employment physical.  Tr. 446-47.  They indicated that she had recently

---

[5] Also, on July 31, 2008, an abdominal sonogram was performed with normal results.  Tr. 429.

found a job at a daycare center and noted that Duck was "doing great." Tr. 446-47. Drs. Janani and Narayanan also noted that Duck had been very compliant with her thyroid medication and a review of her systems was completely negative. Tr. 446. On April 14, 2011, Duck again sought treatment at Aultman Physician Center. Tr. 444-45. She complained of left shoulder pain which she reported having had for the 2 prior years. Tr. 444. She denied any depression but indicated that she was experiencing a lot of stress with her ex-boyfriend. Tr. 444. Duck was advised to take Naproxen twice a day for her shoulder pain and to apply heat. Tr. 444. Because her thyroid condition was stable, she was advised to stay on the same regimen. Tr. 444. She was counseled on forms of abuse and advised to seek counseling or to contact her physicians immediately if she needed help. Tr. 444-45.

## 2. Consultative and Reviewing Physicians

### a. Consultative Physician James M. Lyall, Ph.D., ABPN – mental

On August 14, 2006, James M. Lyall, Ph.D., ABPN, conducted a consultative examination. Tr. 365-71. Dr. Lyall administered the Wechsler Adult Intelligence Scale – Third Edition (WAIS-III).[6] Tr. 368, 371. Duck's scores on the WAIS-III were as follows: Verbal IQ - 74; Performance IQ - 75; and Full Scale IQ - 72. Tr. 371. Dr. Lyall also administered the Wide Range Achievement Test – Fourth Edition (WRAT-4).[7] Tr. 369, 371.

Dr. Lyall opined that Duck's scores put her in the borderline range of intelligence with equally poor reading and math skills. Tr. 369. He noted that she has a history of depressive difficulties and reported current symptoms of depression without continuing treatment. Tr. 369. Dr. Lyall's diagnoses included major depressive disorder, recurrent, moderate and borderline intellectual functioning. Tr. 369. Dr. Lyall indicated that Duck has both physical and

---

[6] The WAIS-III is an individually administered test of intelligence. Tr. 368.

[7] The WRAT-4 is an objective measure of academic achievement. Tr. 369.

intellectual psychological stressors.  Tr. 369.  He also noted that Duck reported a history of Grave's disease and was taking medication for that condition.  Tr. 368, 369.  While noting that Duck's functional impairment fell at a GAF of 60, when taking into account her depressive symptoms, Dr. Lyall assessed her with a GAF of 55.[8]  Tr. 369.

He opined that Duck's: (1) ability to relate to others, including fellow workers and supervisors, is mildly to moderately impaired by her borderline intelligence and social withdrawal; (2) ability to understand and follow instructions is moderately impaired by her borderline intellectual functioning; (3) ability to maintain attention and perform simple repetitive tasks is mildly to moderately impaired; and (4) ability to withstand the stress and pressure associated with day-to-day work activity is moderately impaired.  Tr. 369.  Dr. Lyall indicated that Duck would have difficulty in jobs that require reading skills or good math ability and would have difficulty understanding complex directions upon initial presentation.  Tr. 369.

### b.  Reviewing Physician Kristen Haskins, Psy.D. – mental

On August 28, 2006, Kristen Haskins, Psy.D., completed a Mental RFC (374-77) and a Psychiatric Review Technique (Tr. 378-91).  Dr. Haskins found that Duck is moderately limited in the following six categories: (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention and concentration for extended periods; (4) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) ability to interact appropriately with the general public; and (6) ability to accept instructions and respond appropriately to criticism from

---

[8] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

supervisors.  Tr. 374-75.  Of the remaining 14 categories, including the ability to understand, remember and carry out very short and simple instructions, Dr. Haskins found that Duck was not significantly limited.  Tr. 374.  Dr. Haskins opined that Duck "retains the ability to understand and recall simple tasks in a work environment without a lot of social interaction."  Tr. 376. Since there was no treating source, Dr. Haskins gave controlling weight to Dr. Lyall's consultative examination report and she also concluded that Duck's allegations were not fully supported by the objective medical evidence of record and, thus, considered Duck's allegations to be only partially credible.  Tr. 376.

In the Psychiatric Review Technique, Dr. Haskins indicated that Duck suffers from major depressive disorder, recurrent, moderate and has borderline intellectual functioning.  Tr. 381, 382.  However, she opined that neither of those conditions satisfied a Listing.  Tr. 381, 382.  In assessing the "B" criteria of the Listings, Dr. Haskins also opined that Duck has mild limitations in her activities of daily living and moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace, with no episodes of decompensation.  Tr. 388.

### c.  Consultative Physician Murrell Henderson, D.O. – physical

On October 3, 2006, Murrell Henderson, D.O., conducted a consultative examination. Tr. 394-99.  Dr. Henderson's impression following his examination of Duck was hypothyroidism, by history; suspect history of hyperthyroidism; and inconsistent findings in sensory discrimination at the upper and lower extremities.  Tr. 395.  He opined that Duck "has no difficulty in communication, has normal hearing, speech, and vision.  Carrying moderate weight [for] moderate distances does not appear to be problematic.  Fine coordination is normal in both upper extremities.  She does not appear to have any problems with ambulation and transportation does not appear to be problematic."  Tr. 395.

**C.    Testimonial and Functional Report Evidence**

**1.    Duck's Function Report**

On July 17, 2006, Duck completed a Function Report wherein she described her daily activities and abilities.  Tr. 267-74.  She has no problems with personal care.  Tr. 269.  However, sometimes she needs reminders to take her medication.  Tr. 269.  She drives and is able to go out alone.  Tr. 270.  She goes outside three times each day.  Tr. 270.  She sometimes needs assistance with shopping because she becomes overwhelmed when around people.  Tr. 270.  She takes care of her children; does laundry and household chores daily; cooks simple meals; and can pay bills, count change, and handle bank accounts.[9]  Tr. 268-70.  She watches some television but has no hobbies.  Tr. 271.  She can walk for about 45 minutes before needing to rest and, after stopping, she needs to rest for about 30 minutes before continuing to walk.  Tr. 272.

She spends time with family but, because of her mood swings, has problems getting along with others, including authority figures.  Tr. 271, 273.  She does not like to work with others.  Tr. 273.  She lacks focus, is easily distracted, and quickly forgets things.  Tr. 272, 273.  If shown how to do something, she can follow spoken, but not written, instructions.  Tr. 273.

**2.    Duck's Testimony**

Duck was represented by counsel at the administrative hearing on August 2, 2011.[10]  Tr. 37-81.  Duck testified that the most significant problem that prevents her from working is her inability to focus.  Tr. 58.  Also, she stated that her inability to get along with people prevents her from working; she has mood swings from her medication.  Tr. 59.  Additionally, Duck stated that her sleeping problems prevent her from working; because of stress she cannot fall asleep and

---

[9] Duck indicated that she sometimes has trouble writing out checks and needs assistance from her boyfriend.  Tr. 271.  She also indicated that, since her illness, she is impulsive with money.  Tr. 271.

[10] Duck also testified and was represented by counsel at the March 10, 2009, administrative hearing.  Tr. 99, 104.

only gets two to three hours of sleep each night.  Tr. 59-60.  She indicated that her thyroid condition causes problems with her ability to work.  Tr. 61.  She takes medication for her thyroid disorder.  Tr. 61.  However, as a result of her thyroid disorder, she cannot sleep, be around people, or focus and has panic attacks sometimes.  Tr. 61-62.  She stated that she has no physical problems that preclude her from working.[11]  Tr. 60.

She is not receiving any mental health treatment and has not been treated in the emergency room for mental health issues.  Tr. 60-61.  She has never required treatment in the hospital for more than a day.  Tr. 61.  She does not take any medication for mental health issues.  Tr. 62.

Duck discussed her past employment and indicated that she quit or was fired from a number of different jobs for various reasons, including lack of transportation (Tr. 75), lack of childcare (Tr. 71, 72, 73, 74), a lack of training and/or an inability to learn certain jobs and making mistakes at jobs[12] (Tr. 65-67, 69, 72-73, 75-77), and difficulty in performing the physical demands of certain jobs[13] (Tr. 70).

Duck stated that her ex-boyfriend assisted her with completing her social security applications.  Tr. 79.  He read the questions to her and wrote down the answers that she provided.  Tr. 79.  She stated that she cannot understand a whole newspaper article.  Tr. 79.

---

[11] During her counsel's examination, Duck indicated that she does have some problems with both her rotator cuffs for which she takes Ibuprofen.  Tr. 77-78.

[12] Duck stated she was removed from her K-mart cashier position because she could not figure out how to operate the register and she was fired from her K-mart job at the one-hour photo booth because she incorrectly mixed chemicals.  Tr. 65-67.

[13] Duck stated that she could not perform a job in the plastics industry because the shifts were 12 hours long and it was too hard to stand for that long of a time.  Tr. 69-70.

### 3.  Vocational Expert's Testimony

Vocational Expert Mr. Masey ("VE") testified at the hearing.  Tr. 81-93.  The VE stated that Duck's past work included work as a cleaner and groundskeeper, stocker and cashier.  Tr. 81-82.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, past work experience, and education with certain restrictions.  Tr. 82-84.  The ALJ indicated that, for the education level, the VE should assume word reading with a grade equivalent of 3.0; sentence comprehension with a grade equivalent of 5.2; spelling with a grade equivalent of 2.8; and math computation with a grade equivalent of 3.7.[14]  Tr. 82-83.  The ALJ indicated that the hypothetical individual would be restricted as follows: limited to medium level work; she can lift or carry 50 pounds occasionally and 25 pounds frequently; she can stand and/or walk with normal breaks for about six hours in an eight-hour workday; she can sit with normal breaks for about six hours in an eight-hour workday; with the exception of limitations for lifting and/or carrying she has no restriction on her ability to push and/or pull, including the operation of hand or foot controls; she is limited to simple work-related decisions with generally relatively few workplace changes; she is limited to occasional interaction with supervisors; she is limited to occasional and superficial interaction with co-workers and the general public; and she cannot work in an environment with high quotas, strict time limits or deadlines, or fast-paced production demands, such as those encountered in piece work or on fast moving assembly lines.  Tr. 82-83.

---

[14] The ALJ based the grade equivalencies on the Wide Range Achievement Test-4 (WRAT-4) test scores set forth in psychologist Dr. James M. Lyall's August 14, 2006, consultative examination report. Tr. 82, 371.  Although the ALJ's educational assumptions were based on the WRAT-4 test scores, the grade equivalent relayed to the VE for sentence comprehension is not exactly as stated in Dr. Lyall's report.  Tr. 82, 371.  Dr. Lyall's report reflects that Plaintiff's sentence comprehension is equivalent to a 5.7 grade level.  Tr. 371.  However, the ALJ stated that the grade equivalent for sentence comprehension was 5.2.  Tr. 82.  This minor discrepancy, which is likely a typographical error, has not been cited by Plaintiff as error and, even if raised as error, would be harmless because the grade equivalency noted by the ALJ was lower, not higher, than that contained in Dr. Lyall's report.

The VE indicated that the hypothetical individual would be able to perform the cleaner portion of Duck's past work as a cleaner/groundskeeper as the cleaner job is generally performed by employees.[15]  Tr. 83-85.  The VE then indicated that there were other unskilled jobs available to the hypothetical individual described by the ALJ, including laundry laborer,[16] wire worker[17] and electronics worker.[18]  Tr. 85-86.  The VE also indicated that, even if the hypothetical worker had no past relevant work or was illiterate, she could perform the three noted jobs.  Tr. 86.  The ALJ asked the VE a number of different hypotheticals, including one which changed the exertion level from medium to light and one that added additional physical and environmental restrictions, including a requirement for a sit/stand option.  Tr. 87-81.  The VE indicated that both the wire worker and electronics worker positions would be available.  Tr. 88-91.  Additionally, the VE indicated that a bench assembler position would be available to the hypothetical individual.[19]  Tr. 88-91.   The VE also indicated that his opinion would not change if the hypothetical individual had no past relevant work and if the individual were totally illiterate.  Tr. 92.  The VE then testified that, if the hypothetical individuals were off task 20 percent of the workday or missed three days each month, there would be no jobs available.  Tr. 92.  The VE confirmed that his testimony was consistent with the Dictionary of Occupational

---

[15] The hypothetical worker would not be able to perform the past cleaner job as Duck actually performed it because Duck performed the cleaner job in combination with the groundskeeper job and the combination of going inside and outside to perform the combination cleaner/groundskeeper job would go beyond a few workplace changes.  Tr. 84.

[16] The VE indicated that laundry laborer is a medium unskilled job with 1,200 positions available in Northeast Ohio and 180,000 available nationally.  Tr. 86.

[17] The VE indicated that wire worker is a light unskilled job with 750 positions available in Northeast Ohio and 105,000 available nationally.  Tr. 86.

[18] The VE indicated that electronics worker is a light unskilled job with 450 positions available in Northeast Ohio and 60,000 available nationally.  Tr. 86.

[19] The VE indicated that bench assembler is a light unskilled job with 800 positions available in Northeast Ohio and 110,000 available nationally.  Tr. 86.

Titles[20] and that his testimony concerning the sit/stand option was based on a combination of the

DOT as well as his own experience.[21]  Tr. 93.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant

---

[20] The Dictionary of Occupational Titles is published by the Department of Labor.  *See* 20 CFR § 404.1566(d)(1).

[21] The VE noted that a sit/stand option is not listed in the DOT.  Tr. 93.

work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[22] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his August 26, 2011, decision, the ALJ made the following findings:

1.      Plaintiff meets the insured status requirements through March 31, 2007.  Tr. 16.

2.      Plaintiff has not engaged in substantial gainful activity since December 20, 2002.  Tr. 16.

3.      Plaintiff has the following severe impairments: (1) Grave's disease (thyroid disease), well controlled with Synthroid; (2) major depressive disorder; and (3) borderline intellectual functioning.   Tr. 16-17.  Plaintiff's Vitamin B12 deficiency is a non-severe impairment.  Tr. 16-17.

4.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.[23]  Tr. 17-19.

---

[22] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[23] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

5.   Plaintiff has the residual functional capacity ("RFC") to perform medium work; she can lift and/or carry 50 pounds occasionally and 25 pounds frequently; she can stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; she can sit (with normal breaks) for a total of about six hours in an eight-hour workday; she has no restrictions on her ability to push and/or pull (including the operation of hand and/or foot control), except she is limited by her restrictions on lifting and/or carrying; she is limited to simple routine, repetitive tasks, involving only simple, work-related decisions and in general, relatively few workplace changes; she is limited to occasional interaction with supervisors; she is limited to occasional and superficial interaction with coworkers and the general public; she cannot work in an environment with high quotas, strict time limits or deadlines, or fast-paced production demands (such as those encountered in piecework or on a fast moving assembly line).  Tr. 19-25.

6.   Plaintiff is unable to perform any past relevant work.  Tr. 25.

7.   Plaintiff was born on October 5, 1966, and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date of December 20, 2002.  Tr. 25.

8.   Plaintiff has a "marginal education," with an actual academic achievement level that is accurately represented by her WRAT-4 testing, which showed the following results: word reading standard score 63, grade equivalent 3.0; sentence comprehension standard score 71, grade equivalent 5.7; spelling standard score 2.8,[24] grade equivalent 2.8; math computations standard score 68, grade equivalent 3.7, and reading composite score 65.  Tr. 25.

9.   Transferability of jobs skills is not an issue because Plaintiff's past relevant work is unskilled.  Tr. 25.

10.  Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in the national economy that Plaintiff can perform, including laundry laborer, wire worker, and electronics worker. Tr. 26-27.

Based on the foregoing, the ALJ determined that Duck had not been under a disability

from December 20, 2002, through the date of the decision.  Tr. 27.

---

[24] The standard spelling score reflected in the WRAT-4 is 63 with a grade equivalent of 2.8.  Tr. 371.  Plaintiff does not raise, as error, what appears to be a typographical error.

## V. Parties' Arguments

### A.     Plaintiff's Arguments

First, Plaintiff argues that the ALJ erred in not concluding that her impairments equaled Listing 12.05C.[25]  Doc. 17, pp. 9-14.  Duck asserts that, in assessing whether her impairments equaled Listing 12.05C, the ALJ failed to consider her "marginal education" as evidenced by the WRAT-4 testing completed by Dr. Lyall.  Doc. 17, pp. 10-14.  She argues that, had the ALJ properly considered the "marginal education" evidence alongside her full scale IQ score of 72, he would have found Duck's impairments to equal Listing 12.05C.[26]  Doc. 17, pp. 10-14.  Duck requests reversal on the basis that her impairments equal Listing 12.05C or a remand for further analysis under Listing 12.05C.  Doc. 17, p. 14.

Second, Plaintiff argues that the ALJ erred in his determination of her mental RFC.  Doc. 17, pp. 14-16.  She argues that, although the ALJ did take into account her limited intellectual functioning when assessing her mental RFC, the evidence supports a more restrictive mental RFC.  Doc. 17, pp. 15-16.  Duck requests a remand for proper consideration of the evidence in assessing her mental RFC.  Doc. 17, p. 16.

### B.     Defendant's Arguments

In response, the Commissioner first argues that Duck does not meet or equal Listing 12.05C.  Doc. 18, pp. 8-10.  Defendant asserts that Plaintiff has failed to support her argument with a medical opinion showing that her impairment equals a Listing.  Doc. 18, pp. 8-10.  Further, Defendant asserts that at least two medical opinions in the record[27] show that Plaintiff's

---

[25] Listing 12.05 relates to mental retardation.

[26] In presenting her argument that the evidence shows that she equals Listing 12.05C, Duck also argues that she satisfies the other requirements of Listing 12.05C.  Doc. 17, pp. 9-14.

[27] Defendant cites to Dr. Lyall's and Dr. Haskins' opinions wherein they indicate that Duck has borderline intellectual functioning, not mental retardation.  Doc. 18, p. 10.

impairment does not equal Listing 12.05C.  Doc. 18, p. 10.  Thus, Defendant asserts that Duck's argument that the ALJ erred in his Listing analysis fails.  Doc. 18, pp. 9-10.

Second, the Commissioner argues that the ALJ properly formulated Duck's RFC and accounted for her limited intellectual functioning.  Doc. 18, pp. 10-11.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.** **The ALJ did not err in finding that Plaintiff's impairments did not meet or equal Listing 12.05C.**

Listing 12.05 relates to mental retardation. To qualify as disabled under that Listing, a claimant needs to satisfy <u>both</u> the diagnostic description in the introductory paragraph of Listing 12.05 <u>and</u> one of the four sets of criteria found in Subparts A through D.  20 C.F.R. § 404.1525(c)(3); *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001).  The diagnostic description is as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The additional Subpart C criteria are:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05C.

Because Duck has a full scale IQ of 72, she acknowledges that she does not *meet* Listing 12.05C.  Doc. 17, pp. 12-13.  However, she argues that, "when considering her IQ of 72 aside her significantly deficient reading and writing abilities, she *equals* [the C criteria of] Listing 12.05C."  Doc. 17, pp. 13-14 (emphasis supplied) (relying on Social Security Administration Program Operations Manual System ("POMS") § DI 24515.056 which provides "slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination.").

Duck bears the burden of producing evidence that her impairment *equals* a Listing; "[s]he must present medical findings equal in severity to *all* the criteria for the one most similar to the listed impairment."  *Sullivan v. Zelby*, 493 U.S. 521, 531 (1990); *see also* POMS § DI 24515.056 ("a decision of medical equivalence will be based only on medical evidence that is supported by medically acceptable clinical and laboratory diagnostic techniques."); *see also Byrne v. Astrue*, 2012 WL 5988639, * 13 (S.D. Ohio Nov. 29, 2012), *report and recommendation adopted by*, 2013 WL 26124 (S.D. Ohio Jan. 2, 2013) ("[m]edical equivalence must be supported by medically acceptable clinical and laboratory diagnostic techniques") (internal quotations and citations omitted); *see also Jefferson v. Astrue*, 2012 WL 4364247, * 7 (S.D. Ohio Sept. 24, 2012), *report and recommendation adopted by*, 2012 WL 5512355 (S.D. Ohio Nov. 14, 2012). Duck has failed to identify any medical opinion demonstrating that her impairment *equals* Listing 12.05C.  Accordingly, Duck's claim that the ALJ erred in not finding medical

equivalence with the C criteria fails.  *See Jefferson*, 2012 WL 4364247, * 7 (claimant failed to carry his burden of demonstrating medical equivalence where he failed to identify a medical opinion showing his impairment equaled Listing 12.05C).

Plaintiff's attempt to show that she meets the diagnostic criteria of Listing 12.05C also fails.  To show that she satisfies the diagnostic criteria of Listing 12.05C, Plaintiff points to records that show enrollment in special education classes and mostly failing grades.  However, she does not identify diagnoses of mental retardation before or after age 22.  Moreover, both consultative physician Dr. Lyall and state reviewing physician Dr. Haskins concluded that Duck suffered from borderline intellectual functioning, not mental retardation.  Tr. 369, 382.  Although Listing 12.05 does not specifically require a diagnosis of mental retardation, a diagnosis of borderline intellectual functioning is relevant in determining whether a claimant satisfies the diagnostic criteria under Listing 12.05.  *See Cooper v. Comm'r of Soc. Sec.*, 217 Fed Appx. 450, 452 (6th Cir. 2007) (drawing a distinction between a diagnosis of mental retardation and one of borderline intellectual functioning); *West v. Comm'r Soc. Sec,* 240 Fed. Appx. 692, 698–699 (6th Cir.2007) (suggesting that a diagnosis of borderline intellectual functioning is relevant when determining whether a claimant has shown deficits in adaptive functioning).  Further, notwithstanding the WRAT-4 test scores, Dr. Lyall did not conclude that Duck had significant or marked impairments in her work-related abilities.  Tr. 369.  Rather, he found that Duck was mildly to moderately impaired in her ability to relate to others and in her ability to maintain attention and perform simple repetitive tasks; and moderately impaired in her ability to understand and follow instructions and withstand the stress and pressure associated with day-to-day work activity.  Tr. 369.   Similarly, Dr. Haskins did not find marked impairments.  Tr. 388.  Thus, even if Duck were able to demonstrate that she met the C criteria, Duck has not

demonstrated, and the medical evidence does not support a finding, that she meets or equals the diagnostic criteria.  *West v. Comm'r Soc. Sec,* 240 Fed. Appx. at 699 (concluding that the claimant failed to demonstrate that he met or equaled Listing 12.05C because the medical evidence did not show deficiencies in adaptive functioning).

Based on the foregoing, Plaintiff failed to meet her burden of showing medical equivalence.  Moreover, substantial evidence, including the medical opinions of Dr. Lyall and Dr. Hasskins, supports the ALJ's finding that Duck's impairment neither meets nor equals Listing 12.05C.[28]  Accordingly, Duck's claim that the ALJ erred in his finding that she does not meet or equal Listing 12.05C is without merit.

**B.     The ALJ's RFC is supported by substantial evidence.**

The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c), 404.1527; *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC."); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").

Duck acknowledges that the ALJ did take her limited intellectual functioning into account when assessing her mental RFC.  Doc. 17, p. 15.  However, she argues that, based on her

---

[28] To the extent that Duck argues that the ALJ did not consider her WRAT-4 scores which showed deficient reading and writing abilities, Duck's argument is unsupported by the record and without merit.  Tr. 22 (the ALJ specifically details the WRAT-4 test results); Tr. 82-83 (the ALJ noted and requested that the VE take into account the WRAT-4 scores when responding to his hypothetical questions).

intellectual difficulties, the ALJ should have found an even more restrictive mental RFC.  Doc.

17, p. 15.  As it relates to her mental RFC, the ALJ determined that:

> [Duck] is limited to simple routine, repetitive tasks, involving only simple, work-related decisions and in general, relatively few workplace changes; she is limited to occasional interaction with supervisors; she is limited to occasional and superficial interaction with coworkers and the general public; she cannot work in an environment with high quotas, strict time limits or deadlines, or fast-paced production demands (such as those encountered in piecework or on a fast moving assembly line).

Tr. 19-25.

In an attempt to show that a more restrictive RFC is warranted, Plaintiff cites to various

pieces of evidence, including her full scale IQ score, WRAT-4 testing results, special education

classes, difficulties at past jobs, etc.  Doc. 17, p. 15.  However, she fails to indicate what

additional limitations should have been assessed based on that evidence.  Doc. 17, p. 17.

Without further articulation, this argument is waived.  *See McPherson v. Kelsey*, 125 F.3d 989,

995–96 (6th Cir. 1997).  ("It is not sufficient for a party to mention a possible argument in the

most skeletal way, leaving the court to . . . put flesh on its bones."); *see also Ehrhart v. Sec'y of

Health & Human Servs.*, 969 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule because

judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque

manner.'").

Moreover, even if not waived, Duck fails to show that the ALJ's decision is not

supported by substantial evidence.  To the contrary, the ALJ assessed Duck's RFC based on all

relevant evidence and his determination of her RFC is supported by substantial evidence.   Duck

argues that the ALJ did not adequately discuss certain evidence relating to her limited intellectual

functioning.  Doc. 17, p. 15.  However, evidence noted by Duck was considered and discussed

by the ALJ.  For example, when concluding that Duck was moderately impaired in

concentration, persistence or pace, the ALJ considered the fact that Duck reported an inability to focus and also noted that Duck testified that her most significant problem impacting her ability to work was related to her difficulty focusing.  Tr. 18, 20.  The ALJ discussed Duck's IQ scores as well as the WRAT-4 scores.  Tr. 22.  He discussed the fact that she reported receiving grades in the D and F range, that she was in special education classes, and that she only completed the 9th grade.  Tr. 22.  He noted that Duck indicated that she cannot read or understand a newspaper and that her boyfried had to assist her with completing her social security application.  Tr. 20, 22.  He indicated that Dr. Henderson opined that Duck had no difficulty in communication.  Tr. 23, 395.  Relative to her past work, the ALJ noted and considered Duck's testimony wherein she indicated that she had trouble learning how to complete job duties and he also considered her testimony that she was unable to sustain work because of babysitting and transportation issues.  Tr. 20, 24.

The ALJ clearly considered evidence relating to Duck's limited intellectual functioning and accounted for those limitations in the RFC.  For example, among other limitations, the RFC limited Duck to simple routine, repetitive tasks involving only simple work-related decisions, and in general, relatively few workplace changes.  Tr. 19.  Since the ALJ's RFC determination is supported by substantial evidence and since Duck has failed to demonstrate that the ALJ did not consider or properly account for her limited intellectual functioning, reversal of the Commissioner's decision is not warranted.

### VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated:  July 22, 2013

_____
Kathleen B. Burke
United States Magistrate Judge

21

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).